# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HIGH ELEVATIONS, LLC, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> SCOTT GARBER, JACOB SADOFF, and ) <br> JORDAN SADOFF, ) <br> Defendants, ) <br> ──────────────────────────── ) <br> ) <br> JACOB SADOFF, JORDAN SADOFF, and ) <br> and SCOTT GARBER ) <br> ) <br> Counter-Plaintiffs, ) <br> v. ) <br> ) <br> ARA ARZOUMIAN and MARSHALL ) <br> SMOLLER, ) <br> ) <br> Counter-Defendants. ) | No. 16 C 01041 <br> Consolidated with No. 16 C 2397 <br><br> Hon. Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff High Elevations, LLC, a company co-owned by Counter Defendants Ara Arzoumanian and Marshall Smoller (collectively, the "HEL parties"), sued Defendants/Counter-Plaintiffs Scott Garber, Jacob Sadoff and Jordan Sadoff (collectively "Defendants") alleging breach of contract in violation of Illinois common law. *See* (Dkt. 4). Defendants filed a counter-complaint against Arzoumanian and Smoller in this proceeding alleging breach of contract (Count I) and unjust enrichment (Count II). *See* (Dkt. 24). Both complaints concern a dispute over an agreement that the parties made regarding the opening of a Sky Zone franchise trampoline park. Following discovery, the Defendants moved for summary judgment arguing that as a matter of law they were entitled to recover money that they had tendered to the HEL parties as part of the agreement. The Court denied summary judgment and held that there was

1

some ambiguity in the language of the agreement regarding whether three specified payments were due after three separate events occurred or whether the payments were due regardless. (Dkt. 81). In denying the Defendants' Motion for Summary Judgment, the Court held that a trial was necessary and allowed parol evidence to be presented to determine the parties' intent with respect to (1) the meaning of the phrase "proceed with Sky Zone franchise" as used in the contract; and (2) whether the contract intended for any refunds if the park did not come to fruition. *See id.* The Court held a one-day bench trial.

## FACTS FROM THE TRIAL

### Pre-Agreement Negotiations and Party Actions

Arzoumanian testified that he and Smoller are business partners who originally became involved in the trampoline park business in the beginning of 2014 and opened their first High Elevations trampoline park in New Jersey at the end of 2014. *Tr.* at 20–21. In November 2014, Arzoumanian contacted Jordan Sadoff who was in Chicago and told him he and Smoller were working on an exciting project and wanted to get Jordan and his brother Jacob Sadoff involved. *Tr.* at 21. Arzoumanian and Smoller had met the Sadoff brothers through a mutual friend about fifteen years before and since then had done a few smaller business deals with them. *Tr.* at 21-22; (Dkt. 84-1, at 2).[1] The Sadoff brothers traveled to New Jersey to learn about Arzoumanian and Smoller's business idea. When they arrived, Arzoumanian and Smoller required that they sign a Non-Disclosure and Non-Compete Agreement ("November 2014 Agreement") before telling them about their proposed business venture. *Tr.* at 22; *see also* (Sadoff 6). At trial, Arzoumanian referred to the November 2014 Agreement as "the non-disclosure agreement."

---

[1] At trial the parties stipulated to the submission of trial exhibits and both were tendered to the court as evidence. The Plaintiff's trial binder is cited as HELX #; and the Defendants' trial binder is cited as Sadoff #. The Final Pre-Trial Order is included at the front of the Plaintiff's trial binder and is a part of the record on ECF.

2

However, he testified the purpose behind the November 2014 Agreement was two-fold: (1) to prevent the Sadoffs from taking the High Elevations trampoline park concept for their own use, and (2) to partner with the Sadoff brothers in order to expand the High Elevations business to the Chicagoland area. *Tr.* at 23, 44-45.

After the signing of the November 2014 Agreement, Arzoumanian and Smoller told the Sadoff brothers (Garber was not part of the agreement at the time) about their trampoline park concept, showed them their High Elevations park, which at the time was about 90% complete, and then showed them a couple of the Sky Zone parks in the area. *Tr.* at 22–23, 77–79. Azroumanian testified that he was very excited to bring the trampoline park idea to the Sadoffs because they are "sharp guys" and "business-minded" and "know how to grow businesses." *Id.* at 23. He hoped they could all partner together to open a second High Elevations trampoline park in Chicago. *Id.* at 23.

At trial, Jordan Sadoff testified that the parties discussed opening one or more Chicago-area trampoline parks with High Elevations and that he too expressed excitement about the business opportunity. *Id.* at 79. Arzoumanian testified that when he told the Sadoff brothers about the concept, they responded that "they never would have guessed this concept themselves" and "never would have even know about this business as far as getting involved in it and the success rate of it" unless Arzoumanian and Smoller had shown them. *Id.* at 22. Arzoumanian also admitted, however, that there were "hundreds" of trampoline parks all over the country. *Id.* at 46–47. Indeed, Jordan Sadoff testified that, while he did not know a lot about the trampoline park concept at that time, he knew that trampoline parks existed and was at least familiar with the idea. *Id.* at 78. Sadoff also testified that discussions in New Jersey were "on a very high

3

level" and that they "more so discuss[ed] the excitement around the trampoline park industry." *Id.* at 79.

The Sadoffs returned to Chicago and folded their business partner Scott Garber into the proposed venture. *Id*. The parties proceeded to negotiate a joint venture, initially proposing a 50/50 venture between the HEL parties and the Sadoffs and eventually agreeing to a 40/60 venture between the HEL parties and all three Defendants. *Id*. at 24–25, 88, 110.

Upon returning to Chicago, the Defendants did "quite a bit" of research into the industry and learned it "was much more complicated than what [they] initially thought." *Id.* at 79-80. Accordingly, Jordan Sadoff testified that, through their research, they became concerned about not having a proven concept or brand name and thought it would be better to work underneath the Sky Zone franchise. *Id.* at 81. Sadoff testified that when first he discussed the idea of using the Sky Zone brand with Arzoumanian and Smoller, they were "fine with it" but noted they would have to become silent partners in the venture as their own High Elevations trampoline park was nearly open. *Id.* at 81. Sadoff testified, however, that he, his brother and Garber eventually decided to open the Sky Zone franchise on their own. *Id.* at 81; *see also id*. at 89 ("Q. And after looking at locations, that's when you told Ara and Marshall or you and Scott and Gar - - and Jacob told Ara and Marshall that you would not be working with them at all. A. It was some period of time after that. I don't remember the exact amount of time, but that's correct."); *id*. at 124 (Garber direct examination) ("At some point did you, Jake, and Jordan decide to go it alone without High Elevations? A. We did."). He further testified that Arzoumanian and Smoller were not happy about this decision and wanted the Sadoff brothers and Garber to pay them money pursuant to the November 2014 Non-Disclosure and Non-Compete Agreement. *Id.* at 81-82.

4

## The January 2015 Agreement

The parties had multiple discussions regarding what this payment would be, and it changed over time, starting at $500,000 and eventually negotiating it down to $175,000. *Tr.* at 27-33. On January 15, 2015, Azroumanian sent the group email which stated:

> Gentlemen,
>
> Just to confirm our conversation from today, Marshall and I agree to be paid $175,000 (the following as full compensation) towards the trampoline concept from Jake Sadoff, Jordan Sadoff, and Scott Garber:
>
> 25% ($43,750) Upon signing of lease at Orland Park location.
> 50% ($87,500) Upon City approval to build trampoline park
> 25% ($43,750) Upon Landlord construction of the park.
>
> Upon receipt of the $175,000 no other monies shall be due to Ara Arzoumanian or Marshall Smoller.

*Id.* at 33; (HELX 9, at PRO 070–71). After receiving this email, the Defendants provided a contract that they had written for signature. *Tr.* at 34. Shortly thereafter, the parties signed an Agreement on January 19, 2015 ("January 2015 Agreement"). *See* (HELX 1, at 1). As relevant to the parties' dispute, the January 2015 Agreement states:

> **4.** **One-Time Royalty Payment**. In the event that the Garber and Sadoff Parties *proceed with the Sky Zone franchise* located in Orland Park, Illinois, the Garber and Sadoff Parties shall pay the Ham [sic] Parties a one-time royalty payment in the sum of One Hundred Seventy Five Thousand and 00/100 Dollars ($175,000.00) as follows:
>
> > (i) Twenty percent (25%) [sic] or the sum of Forty Three Thousand Seven Hundred Fifty ($43,750.00) due upon the execution of a lease for a location in Orland Park, Illinois; and
> >
> > (ii) Fifty Percent (50%) or the sum of Eighty Seven Thousand Five Hundred and 00/100 Dollars ($87,500.00) at such time as the Garber and Sadoff parties receive any and all required permits and licensing required to construct Sky Zone in trampoline park at the Orland Park, Illinois[sic]; and
> >
> > (iii) Twenty Percent (25%) [sic] or the sum of Forty Three Thousand Seven Hundred Fifty and 00/100 Dollars ($43,750.00) due when the

5

> landlord begins its construction of landlord's work pursuant to the lease for the Orland Park, Illinois.
>
> It is understood and agreed that the payments by the Garber and Sadoff Parties pursuant to this Paragraph 4 are *expressly conditioned* on the occurrence of items 4(i), (ii) and (iii). Nothing contained in this Paragraph 4, obligates the Garber and Sadoff Parties to execute a lease for the Orland Park, Illinois location or *proceed with a Sky Zone franchise*.

*See* (HELX 1, at 1-2) (emphasis added). The parties disagree on which side requested that the "one-time royalty payment" be segmented into three separate payments with attached conditions but do not dispute that the January 2015 Agreement was the operative contract. *Tr.* at 35, 82–83; 132–34.

Subsequently, the Sadoff brothers and Garber formed the company SG Trampoline, LLC, secured a location for a Sky Zone franchise in Orland Park and signed a franchise agreement with Sky Zone. *See* (HELX 3); *see also Tr.* at 93. When the lease for the Orland Park location was executed, as contemplated by paragraph 4(i) of the Agreement, the Sadoffs and Garber made a payment of $43,750.00 to Arzoumanian and Smoller on February 13, 2015. *See* (Dkt. 84-1, at ¶¶ 17-19); *Tr.* at 84, 102, 114–15, 125. Furthermore, at some point the landlord of the Defendants' tentative Orland Park location began construction on the property. *See* (Dkt. 84-1, at ¶ 21); *see also Tr.* at 37. In March 2015, Arzoumanian demanded, via email, payment of the balance of the agreement based on his understanding that conditions 4(ii) and 4(iii) had been fulfilled. (HELX 9, at 087–88). The Defendants did not pay. The Defendants' franchise deal ultimately fell through because they were unable to obtain the necessary permits and had issues with their landlord, so they never actually opened the Sky Zone-franchised attraction in Orland Park. *See* (Dkt. 84-1, at ¶¶ 22-23); *Tr.* 36-37; 84; 106; 115-16. Accordingly, in October 2015, they demanded a return of the $43,750 payment made to the HEL parties pursuant to 4(i). *See* (HELX 3). These consolidated lawsuits are the result of the parties' impasse.

a. *"proceed with Sky Zone franchise"*

At trial, Arzoumanian testified that he believed the payment negotiated in the January 19, 2015 Agreement "was based on the concept of [the Defendants] opening a park. It wasn't based upon if they opened a park." *Tr*. at 52. He further testified that his understanding of the agreement was that he expected to be paid regardless of whether the Defendants actually ended up competing with High Elevations. *Id*.; *see also id.* at 47 ("Q. . . . If they did not do a franchise on their own, there would be no reason to pay you, right? A. Wrong."). In attempt to drive this point home at trial, Arzoumanian repeatedly referred to the Non-Disclosure and Non-Compete Agreement merely as the "non-disclosure agreement." Similarly, Smoller testified that he understood monies to be due under the Agreement even if Defendants did not open their own trampoline park. *Id*. at 61 ("Q. Okay. My question was on the 175, that was to be paid if they went and opened up their own trampoline park, right? A. No."). However, both Arzoumanian and Smoller had given contradictory answers in their depositions when asked the same or similar questions, and they were impeached on this point. *See Tr*. at 48 (Arzoumanian cross examination) ("Do you recall being asked this question and giving this answer? 'Question: And if they did not do a franchise on their own, there would be no reason to pay you.' 'Answer: Correct.' Do you recall being asked that question and giving that answer? A. I don't -- I don't specifically recall."); *id*. at 62–63 (Smoller direct) ("'Question: Did you negotiate the price down to 175,000 with Jordan? Answer: Yes. Question: That was if they went and opened up their own trampoline park, right? Answer: Yes.' Do you remember being asked those questions and giving those answers? A. No.").

Conversely, the Defendants all testified that they understood "proceed" as meaning "to open a park." *Id*. at 84; 104; 125. Specifically, Jordan Sadoff was asked "[a]nd it says there,

7

'proceed with the Sky Zone.' How did you interpret 'proceed' there," to which he responded, "[m]eaning that we proceed -- that we open the Sky Zone." *Id.* at 84. Jacob Sadoff likewise testified that "'proceed' means to me opening the park for business." *Id.* at 104; *see also id.* at 107 ("Q. And for purposes of this agreement, what does 'proceed' mean to you? A. Opening the park for business."). And Garber testified that he understood "proceed" to mean "opened for business." *Id.* at 125. On this point, however, Jordan Sadoff admitted that Section 4 of the Agreement does not contain the word "open." *Tr.* at 100.

Arzoumanian's and Smoller's position that the Sadoffs and Garber owe them the entire $175,000 for sharing the "trampoline park concept" is simply untenable. The purpose of the initial Non-Disclosure and Non-Compete Agreement was to prevent the Sadoffs from opening a trampoline park without Arzoumanian and Smoller. *See* Tr. at 44 (Arzoumanian cross examination) ("So what was the purpose of the non-disclosure? A. Well, we didn't want them to go out on their own and tell other people about it and maybe do it behind our backs or do it themselves, and that was the purpose of the non-disclosure agreement, because we wanted to be involved with them as partners."). The fact that Arzoumanian described it as only a "non-disclosure agreement" at trial is of no event. His concern in November 2014 was that the business-savvy Sadoffs would actually open a park and make money without him and Smoller. He therefore cannot credibly claim that his "disclosure" of the trampoline park concept itself was so valuable as to require contractual protection—he admitted the concept was well-known as there were hundreds of parks already operating throughout the nation. The purpose of the contract was to ensure the Defendants did not profit from the concept without including Arzoumanian and Smoller. It follows that, as Arzoumanian and Smoller both testified in their

8

depositions, the only reason the Defendants would owe them any money would be if they opened an operating park without them. *See, e.g.*, Tr. at 48, 63–63.

      b.   *"expressly conditioned"*

Paragraph 4 provides, "It is understood and agreed that the payments by the Garber and Sadoff Parties pursuant to this Paragraph 4 are *expressly conditioned* on the occurrence of items 4(i), (ii), and (iii)." (emphasis added). At trial, Arzoumanian testified that he found the term "expressly conditioned" to be "pretty vague." *Tr*. at 50; *see also id.* ("Q. Okay. You did not know, sir -- you didn't understand what 'expressly conditioned' means in this agreement, true? A. No, it's – it's rather vague."). Arzoumanian's lack of knowledge as to the meaning of this term was confirmed by his deposition testimony:

> Q.    Okay. Again, I'm going to refer you to your deposition. Page 57, line 8 through 11. I'm going to ask you if you remember being asked these questions and giving these answers. 'Question' -- I'm starting on -- actually starting line 4.
>
> > 'And 'expressly conditioned' to you, tell me -- to you means, tell me what -- again –
> > 'Answer: I don't know what 'expressly conditioned' means.
> > 'Okay. So you signed this document without knowing what 'expressly conditioned' means, right?
> > 'Answer: Correct.'
>
> Do you remember being asked those questions and giving those answers?
>
> A.    I don't remember. It was such a long time ago, and you asked a lot of questions.

*Tr*. at 51. Despite his inability to define the legal term, Arzoumanian testified at trial that he understood the Agreement's three payments to be "based on each of these things"—referring to the events set forth in 4(i), (ii) and (iii)—"happening one at a time" and agreed that the "one-time royalty payment" was not in fact a one-time payment because, as he testified, "there [were] three conditions." *Id*.

9

Smoller's testimony on this issue was not helpful. In particular, he was previously deposed and asked the following: "Question: Do you know what 'expressly conditioned' means? Answer: No." *Tr*. at 69. At trial, however, Smoller testified without explanation, "I know what it means." *Id*. At other times, he refused to answer this same question, stating that he believed the questions were meant "to trick me because I'm not a lawyer" and that he does not "do the legal stuff" for High Elevations. *Id*. at 68; 74–75. He continued, "[t]hey started construction. They owe us the payment. That's it. That's the bottom line. It wasn't expressly conditioned on this, this, this has to occur, and this has to occur. That's where he tries to -- he tries to trick me every time he does it." *Id*. at 68.

For their part, the three Defendants all testified that they viewed the conditioned payments merely to be "advances" that were returnable or refundable in the event that the trampoline park was not completed. In particular, Jordan Sadoff testified as follows:

> A. Well, what we had discussed was that we -- that that was to be made once we opened the park. They had subsequently after that fact stated that they wanted to be paid some advances. And then over a period of time, we eventually agreed to give them advances towards the 175,000 that would be due once we opened the park.
> Q. Were those advances to be made at certain benchmarks?
> A. Yes, correct.
> Q. And were those advances to be paid -- were they -- did you consider them to be non-refundable?
> A. I absolutely thought that they were refundable if we did not open the park.

*Tr*. at 82; *see also id*. at 104 (Jacob Sadoff direct examination) ("Q What does 'expressly conditioned' mean to you? A. Means that all three of those conditions need to occur in order for the payments to be earned. Q. And if they did not occur? A. Then we should return the monies back."). Similarly, Garber testified that understood the three payments provided for in

subsections (i), (ii) and (iii) to be payments made as advances and not due and earned but he provided no basis for this understanding.  *Tr.* at 125.

All three Defendants, however, admitted that the Agreement did not use the terms "refund" or "advance."  *See, e.g.*, Tr. at 97 (Jordan Sadoff cross examination) ("Q. It does say that particular line.  However, nowhere does it say that the $43,750 paid pursuant to the landlord -- to you signing a lease with the landlord is returnable if the park doesn't open.  A. Well, since that payment was an advance and it was not due or earned, I clearly interpreted that to be that that money was returnable, because it was not due or earned."); id. at 100 ("Nowhere in Section 4 is the word 'advance' even written.  A. Is that a question?  Q. Yeah.  A. I agree."); *id*. at 125 (Garber cross examination) ("Q. Now, you also testified that it was your understanding that the $43,750 payment was an advance.  Is the word 'advance' anywhere –  A. No, sir.").  As previously stated, the parties do not dispute that the Agreement's first payment of $43,750 was made after Defendants signed a lease for the contemplated Orland Park trampoline park location.  *See* (Dkt. 84-1, at ¶ 19); *Tr.* at 94–95.  And the contemporaneous communications regarding the wire transfer of these funds also do not mention that it is an advance or claim any right to refund or return of the funds in the future.  *See* (HELX 9, at PRO 096–97).

Accordingly, the Defendants' testimony is not credible here.  Their lawyer drafted the language of the January 2015 Agreement.  They are experienced businessmen, and had they truly expected any payments made under subsections (i), (ii) and (iii) to be refundable, they could have and should have provided such language in the January 2015 Agreement itself.  As executed, there is none.  They admit $43,570 is a significant amount of money; yet, they promptly paid it without hesitation after executing the lease as provided in subsection (i), without any mention to the HEL parties that the money was subject to refund.  Finally, the Sadoffs and

Garber admitted at summary judgment that they considered the lease execution to be a condition triggering payment of the $43,570: "After they signed the lease for the Orland Park, IL location," as set forth in subsection (i), they "remitted $43,750 to High Elevations, LLC *pursuant to the conditions* in the Agreement." (Dkt. 84-1 at ¶ 19).

c. *Landlord's Construction*

The Agreement states that a payment of $43,750 is "due when the landlord begins its construction of the landlord's work pursuant to the lease for the Orland Park, Illinois." (HELX 1, at 2). The January 15, 2015 email from Arzoumanian setting forth the terms of the agreement states that "25% ($43,750) Upon Landlord construction of the park." (HELX 9, at 070). On the facts of this case, the parties dispute whether construction as contemplated by their agreement had begun so as to trigger the payment of $43,750 to the HEL parties in 4(iii).

Before trial, the parties submitted that "Defendants' landlord, 66 Orland Square, LLC, began landlord's work on the Sky Zone Park in Orland Park, IL, however, said work was never completed." (Dkt. 84-1) at ¶ 22; *see also Tr.* at 58 (reading a portion of Jacob Sadoff's deposition testimony into the record: "The question was posed to Mr. Sadoff: 'Okay. So did the landlord ever begin construction on the Orland Park, Illinois location? Answer: Yes.'"). At trial, however, the parties disputed whether this work triggered the payment in 4(iii) because that construction was not specifically *for* the trampoline park. Specifically, Jacob Sadoff testified to the following:

> Q. Okay. Now, counsel read a statement from your deposition that you said the landlord began the work.
> A. Yes.
> Q. Can you explain what you -- what you meant by that?
> A. Yes. So the landlord built -- purchased this building in foreclosure, and there was a lot of work needed to be done to the building, to the grounds, the exterior, in order to just make it somewhat habitable and get it ready. It

12

> was one big shell, essentially, when he got it, and he needed to do a lot of prep work to get it up to par. He did some work to the exterior, the facade. Did some work to the parking lots, resurfacing. Did some work with the landscaping. There were some holes in the building that he repaired. And then built a wall in the inside separating into two or three different spaces. So there was a wall that was built to essentially define or create the shell of our space.
>
> Q. Okay. Did the landlord do any work in your space other than putting up the wall separating your space from the adjacent space?
>
> A. Not that I'm aware of or that I saw, no.

*Tr.* at 105–06. The Commercial Lease that Defendants entered into with 66 Orland Square LLC outlined the "Landlord Work" that the landlord was obligated to complete prior to turning over possession to Defendants. *See* (Sadoff 4, at 24). The specific requirements, as laid out in Exhibit C to the lease, included installation of drywall, HVAC units with exterior gas and electrical connections, electoral and gas connections inside the Premises, code-applicable fire and sprinkler systems, and the exterior façade of the Premises." *Id*. Sadoff was asked specifically as to whether this "Landlord Work" had begun:

> Q. And the landlord work, did that include HVAC systems, things of that nature?
>
> A. Yes, HVAC systems, electric, some plumbing. There was some debris that needed to be removed. There was some old light fixtures and such that needed to be removed. There was some further demising that needed to be done. And that stuff was not done.
>
> Q. Okay. So the landlord began to do some work on the building, but did not begin to do work inside your space; is that true?
>
> A. That's correct.

*Id.* at 105–06; *see also id.* at 95 (Jordan Sadoff cross examination) ("Q. -- is your answer he did not begin construction? A. My answer is I do not believe that he began construction for us.").

Arzoumanian, who had observed some of the construction of the facility in 2015, testified that he believed construction on the site was occurring in a way that triggered payment under 4(iii). Specifically, he testified, "I mean, we saw construction trucks outside, we saw some –

13

building's infrastructure being built inside the building as well, and there was a banner at the front that said, 'Coming soon, Sky Zone.' I don't know how much more proof, you know, that I could see." *Tr.* at 37. When specifically questioned as to what he observed "being built on the inside," he responded, "I just saw a lot of people working like on the walls and ceilings and stuff. I knew that there was definitely something going on there. Everything was boarded up, but we were able to see inside from the cracks. And actually we opened one of the doors." *Id.*

But work on "the walls and ceilings and stuff" could have been work required to ready the premise *before* preparing it according to the lease. It is difficult to say because Arzoumanian's provides few details about what he observed—which perhaps is unsurprising considering his vantage point. He did not tour the premise or ask any questions of the people working.

## DISCUSSION

The contract is governed by Illinois law and the parties do not dispute this. The Agreement contains a choice of law provision that "this agreement shall be governed by, enforced under, and construed in accordance with the laws of the State of Illinois as part of the consideration for this agreement." *See* (HELX 1, at 3).

Courts must construe contracts to give effect to the reasonable expectations of the parties to the contract. *See GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 621–22 (7th Cir. 1995) (citations omitted). To preserve such expectations, the Court considers the contract in its entirety. *Id.* at 622. Contract interpretation is ordinarily a matter of law, and if its terms are unambiguous, its meaning is a question for the court. *Brooklyn Bagel Boys, Inc. v. Earthgrains*, 212 F.3d 373, 378, n.1 (7th Cir. 2000). The parol evidence rule "generally forbids the use in evidence of a prior or contemporaneous agreement or terms not included in the [c]ontract." *Id.* at

380. But under Illinois law, extrinsic evidence "can be admitted to discover the parties' genuine intent when a contract is ambiguous." *Id*.

Any ambiguity that may have been present prior to trial has been eliminated by the parties' testimony. Although the preliminary discussions regarding the terms of the agreement give insight into the parties' intentions, those are not contractually binding in the same respect as the final Agreement drafted by the Defendants and signed by the Plaintiff. *See, e.g. Abbott Labs v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999) (Illinois law) (finding that agreement on general terms requiring future negotiation to hammer out more specific terms did not constitute a binding contract). Further, all unambiguous terms of the Agreement are wholly binding on both parties. *See Kallman v. Radioshack, Corp.*, 315 F.3d 731, 736 (7th Cir. 2002).

## I.  The Sadoffs and Garber did not breach the January 2015 Agreement.

Here, it is clear that the parties' intent regarding the meaning of "proceed with Sky Zone franchise" required the Sadoff brothers and Garber to actually open a Sky Zone franchise in order to "proceed" for a variety of reasons. First, the primary purpose of the January 2015 Agreement was to nullify the preexisting Non-Disclosure and Non-Compete Agreement between the parties. Paragraph 5 of the January 2015 Agreement explicitly states: "Upon full payment by the Garber and Sadoff parties . . . . certain non disclosure and non compete agreement dated November 20, 2015 . . . shall be null and void." *See* (HELX 1, at 2). The only reason the Sadoffs and Garber wanted to nullify the Non-Disclosure and Non-Compete Agreement was so they could open their own trampoline park without the contractual consequence of violating that agreement. See, e.g., Tr. at 63 (Smoller direct examination) ("Q. And they decided to go it alone without you and Ara, right? A. What? To do the business without us? Q. Yeah. They decided -- A. Yeah."); id. at 81 (Jordan Sadoff direct examination) ("Q. But at some point, you decided to

go it alone. A. We did."), 89 ("Q. And after looking at locations, that's when you told Ara and Marshall or you and Scott and Gar -- and Jacob told Ara and Marshall that you would not be working with them at all. A. It was some period of time after that. I don't remember the exact amount of time, but that's correct. Q. Okay. And you also wanted to get out of the non-compete slash non-disclosure agreement. A. Once we decided that it wasn't going to be beneficial for us or possible for us to all work together, that's when we discussed that with them."); id. at 124 (Garber direct examination) ("At some point did you, Jake, and Jordan decide to go it alone without High Elevations? A We did. Q And did you have to negotiate a fee for the non-compete agreement? A. We did."). It follows that, if the purpose of the Non-Disclosure and Non-Compete Agreement was to ensure the Sadoffs could not open a park—and make money—without the HEL parties, the purpose of the January 2015 Agreement was to allow the Sadoffs to do just that—*i.e.*, actually open a park without the HEL parties—in exchange for whatever sum the HEL parties demanded.

Second, Arzoumanian and Smoller admit that their original intention in working with the Defendants was to open a High Elevations trampoline park in the Chicago area and that the reason for the November 2014 Non-Disclosure and Non-Compete Agreement was to prevent the Defendants from opening a park with anyone else or on their own. So it makes perfect sense for the HEL parties, when seeking out a business partner, to ensure—via a non-compete agreement—that the Sadoffs and Garber could not open a competing trampoline park for a certain period of time. Following this logic, the only true manner in which a once-business partner turned scorned-competitor could pose a threat is if they *actually* opened a rival trampoline park. Actions leading up to the existence of a potential competitor do not threaten the Plaintiff in the same manner as operating a competing business. Accordingly, evidence of the

Defendants' actions leading up to the failed Sky Zone franchise is not interpreted as proceeding with a franchise.

Additionally, the HEL parties' contention that they entered the January 2015 Agreement demanding payment in exchange for merely providing the Defendants with the *idea* of opening a trampoline park is not credible. Arzoumanian testified that he originally sought out the Defendants so they could partner and open a High Elevations park in the Chicago, utilizing Defendants' business and financial resources. He explained that he knew the Sadoffs could grow a business and hoped they could all open a second park or more in Chicago. This testimony weighs heavily against statements by the Plaintiff that the Agreement was purely an exchange of payment for the idea or concept of a trampoline park. Furthermore, at trial, the Sadoffs and Garber testified and Arzoumanian conceded that a primary reason for the January 2015 Agreement was to abrogate the November 2014 Non-Disclosure and Non-Compete Agreement, in effect permitting the Sadoffs and Garber to contract with Sky Zone.

The January 2015 Agreement provided that the Sadoffs and Garber would receive a total sum of $175,000 "[i]n the event that the Garber and Sadoff Parties proceed with Sky Zone franchise located in Orland Park, Illinois." The sum was an express condition that was necessary to the performance of an obligation. *See Smurfit Newspring Corp. v. Southeast Paper Mfg.,* 368 F.3d 944, 951 (7th Cir. 2004) ("An express condition precedent is imposed by the parties in the terms of the agreement."); *see also Liu v. T & H Machine, Inc.*, 191 F.3d 790, 798 (7th Cir. 1999) ("In Illinois law, a condition precedent is defined as 'an event which must occur, or an act which must be performed by one party to an existing contract before the other party is obligated to perform.') (quoting *Maywood Proviso State Bank v. York State Bank and Trust Co.*, 625 N.E.2d 83, 87 (1993)); 13 Williston on Contracts § 38:6 (4th ed.) ("As a general rule, unless the

17

performance is waived, excused, or prevented by the other party, or unless it repudiates the contract, conditions which are either express or implied in fact must be literally met or exactly fulfilled, or no liability can arise on the promise qualified by the conditions."). Based on the weight of the evidence submitted by the parties at trial and for the reasons explained, "proceed" requires the Defendants to have actually opened a park and competed with High Elevations as competitors in the trampoline park market. As the Defendants, in some ways through no fault of their own, did not actually open a Sky Zone franchise in Orland Park, it cannot be said that they proceeded with a Sky Zone franchise or that the competitor-trampoline park ever came to fruition, and so they were not required to pay the full $175,000 payment.

Because Defendants did not breach the contract, Plaintiff is entitled to no recovery. Recovery on a breach of contract requires a party to establish: (1) the existence of a valid and enforceable contract; (2) performance by the party alleging the breach; (3) breach by the opposing party; and (4) that the party alleging the breach suffered a resultant injury. *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001); *see also Hess v. Bresney*, 784 F.3d 1154, 1159 (7th Cir. 2015). There is no breach here so the third element is not satisfied. There is arguably no injury either because the Plaintiffs lose nothing in entirely walking away from the Defendants.

The agreement required that the total amount of $175,000 be paid to Plaintiffs once the express condition of opening the park occurred. It never occurred. Defendants therefore did not breach the agreement.

## II. The High Elevations Parties Did Not Breach the 2015 Agreement.

It is also clear the events set forth in Paragraph 4 subsections (i), (ii) and (iii) of the January 2015 Agreement are each an express condition that, if triggered, obligated the

18

Defendants to make a payment to the HEL parties. The Defendants argued at trial that any payments made under these subsections were merely "advances" and subject to refund. But nothing in the contract explicitly contemplates a refund or potential forfeiture of money paid under subsections (i), (ii) or (iii). Defendants could have requested such language be included; it was, after all, their attorney who drafted the January 2015 Agreement. Given their experience in entering into various business ventures in the past, it is reasonable to expect that had they in fact expected a right to refund of any money paid to the HEL parties, they would have secured that right in the contract itself. They did not. They also did not hesitate to make the first payment when it became due just days after signing the January 2015 Agreement or clarify at that point—before handing over $43,750—that the money was simply an advance or subject to refund.

Therefore, it is clear the parties understood subsections (i), (ii) and (iii) to be express conditions, each triggering a separate obligation of payment. The parties do not dispute that Defendants executed a lease for a Sky Zone location in Orland Park and, therefore, that the first express condition was met. Accordingly, Defendants were obligated to pay the HEL parties $43,750, which they did. Defendants are not entitled to any refund of that payment.

However, the second and third express conditions were never met and therefore no further payment obligations were triggered. The parties do not dispute that Defendants never obtained the permits and licensing required to construct the Sky Zone park at the Orland Park location. Likewise, High Elevations failed to prove at trial that the conditions set forth in 4(iii) were met. Although Arzoumanian *believes* such construction had started based on his observations that there were construction trucks on the site and people working on the "walls and ceilings and stuff." But these general statements are just insufficient to show that construction as set forth in the specific terms of the lease agreement had commenced. *See, e.g.*, *Midwest Builder*

*Distrib., Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 23 (2007) ("When contracts contain express conditions precedent, strict compliance with such conditions is required.") (citations omitted).

## CONCLUSION

The Agreement drafted by the Defendants required payment to the Plaintiffs in total of $175,000 in exchange for nullification of the November 2014 Non-Disclosure and Non-Compete Agreement and the ability to proceed with a Sky Zone Franchise. The term "proceed" in the Agreement required the Defendants to open a Sky Zone franchise. This did not occur. Because the event entitling the Plaintiffs to a one-time full royalty payment of $175,000 did not occur, the HEL parties are not entitled to the full payment. However, because the events set forth in Paragraph 4's subsections are each express conditions, and there is no dispute that the express condition in 4(i) was met, the HEL parties are entitled to retain the $43,750 payment made by Defendants pursuant to this provision. Defendants do not owe any future payments to Plaintiffs.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: March 30, 2018